RECORD NO. 13-4747(L)
CONSOLIDATED W/13-4761

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

───────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

YOUNIS EL SAYEDRI
and
RUNEEN SABAR,

*Defendants-Appellants.*

───────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA

───────────

**CONSOLIDATED BRIEF OF APPELLANTS**

───────────

Joseph J. McCarthy
DELANEY, McCARTHY,
 & COLTON, P.C.
510 King Street, Suite 400
Alexandria, Virginia 22314
(703) 549-9701
mccarthy@lawdmc.com

Gretchen L. Taylor
TAYLOR LAW COMPANY
10605 Judicial Drive, Suite A-5
Fairfax, Virginia 22030
(703) 385-5529
gretchen@taylorlawco.com

*Counsel for Appellant*
*Younis El Sayedri*

*Counsel for Appellant*
*Runeen Sabar*

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER ENTITIES
WITH A DIRECT FINANCIAL INTEREST IN LITIGATION

ONLY ONE FORM NEED BE COMPLETED FOR A PARTY EVEN IF THE PARTY IS
REPRESENTED BY MORE THAN ONE ATTORNEY.  DISCLOSURES MUST BE FILED
ON BEHALF OF INDIVIDUALS AS WELL AS CORPORATIONS AND OTHER LEGAL
ENTITIES.  COUNSEL HAS A CONTINUING DUTY TO UPDATE THIS
INFORMATION.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Younis El Sayedri, who is the Appellant, makes the following
disclosure:

1.    Is the party a publicly held corporation or other publicly
      held entity?  (    ) YES    ( x ) NO

2.    Does the party have any parent corporations?  (    ) YES
      ( x ) NO

3.    Is 10 percent or more of the party's stock owned by a
      publicly held corporation or other publicly held entity?
      (    ) YES   ( x ) NO

4.    Is there any other publicly held corporation or other
      publicly held entity that has a direct financial interest in
      the outcome of the litigation (Local Rule 26.1(b))?
      (    ) YES   ( x ) NO

5.    Is the party a trade association?  (    ) YES    ( x ) NO

      If yes, identify all members of the association, their
parent corporations, and any publicly held companies that own 10
percent or more of a party's stock?

_____        _____
Joseph McCarthy                        May 23, 2014

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER ENTITIES
WITH A DIRECT FINANCIAL INTEREST IN LITIGATION

ONLY ONE FORM NEED BE COMPLETED FOR A PARTY EVEN IF THE PARTY IS
REPRESENTED BY MORE THAN ONE ATTORNEY.  DISCLOSURES MUST BE FILED
ON BEHALF OF INDIVIDUALS AS WELL AS CORPORATIONS AND OTHER LEGAL
ENTITIES.  COUNSEL HAS A CONTINUING DUTY TO UPDATE THIS
INFORMATION.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Runeen Sabar, who is the Appellant, makes the following
disclosure:

1.    Is the party a publicly held corporation or other publicly
      held entity?  (    ) YES    ( x ) NO

2.    Does the party have any parent corporations?  (    ) YES
      ( x ) NO

3.    Is 10 percent or more of the party's stock owned by a
      publicly held corporation or other publicly held entity?
      (    ) YES   ( x ) NO

4.    Is there any other publicly held corporation or other
      publicly held entity that has a direct financial interest in
      the outcome of the litigation (Local Rule 26.1(b))?
      (    ) YES   ( x ) NO

5.    Is the party a trade association?  (    ) YES    ( x ) NO

      If yes, identify all members of the association, their
parent corporations, and any publicly held companies that own 10
percent or more of a party's stock?

_____          _____
Gretchen Lynch Taylor                    May 23, 2014

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . -iv-

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . 16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.   The District Court Erred When it Denied Rule 29 Motions as
     to Counts One, Five and Six . . . . . . . . . . . . . . 16

     A.   Standard of Review . . . . . . . . . . . . . . . . 16

     B.   Argument . . . . . . . . . . . . . . . . . . . . . 17

          1.   The District Court Erred When it Denied Mr. El
               Sayedri and Ms. Sabar's Rule 29 Motions to Dismiss
               Count One . . . . . . . . . . . . . . . . . . 18

               i.   The Evidence as to Count One Failed to Show
                    Mr. El Sayedri and Ms. Sabar Conspired with
                    Each Other and with Mr. Ali Before 2005,
                    Which Was Five Years after the Alleged Start
                    of the Conspiracy, and the Evidence Reveals
                    That in 2005 Mr. El Sayedri and Ms. Sabar,
                    Rather than Conspire with Each Other to
                    Achieve Alleged Goals of the Conspiracy,
                    Actually Were Working at Cross Purposes in
                    Opposition to Each Other's Goals . . . . 18

               ii.  The Government Neglected to Offer Evidence
                    That Statements in the Applications,
                    Affidavits, and Other Documents Were Material
                    and Were Required by the Immigration Laws and
                    Regulations Prescribed Thereunder . . . . 24

          2.   The District Court Erred When it Denied Mr. El
               Sayedri's Rule 29 Motion to Dismiss Count Five
               . . . . . . . . . . . . . . . . . . . . . . 26

i.   Count Five Failed to State an Offense . . 26

ii.  The Evidence Clearly Established the Passport
     Was Not Falsely Altered . . . . . . . . 34

3.   The District Court Erred When it Denied Mr. El
     Sayedri's Rule 29 Motion to Dismiss Count Six  35

i.   The Evidence Was Insufficient to Establish
     the Statements Were False . . . . . . . 36

ii.  If Any of the Alleged Statements Were Shown
     to Be False, the Evidences Was Insufficient
     to Establish Any Statement Was Material   38

iii. If Any of the Alleged Statements Were Shown
     to Be False and Material, the Evidence Was
     Insufficient to Establish These Statements
     Were Made in a Matter Within the Jurisdiction
     of the Executive Branch of the United States
     Government  . . . . . . . . . . . . . . 39

II.  The District Court Should Have Granted Mr. El Sayedri and
     Ms. Sabar's' Motions for a Mistrial on Count One Because the
     Government Failed to "Connect-up" the Conspiracy by Evidence
     Independent of the Co-Conspirator Hearsay Statements.  . 41

     A.   Standard of Review  . . . . . . . . . . . . . . . 41

     B.   Argument . . . . . . . . . . . . . . . . . . . . 43

III. The District Court Erred When it Failed to Sever Counts
     Nine, Ten and Eleven and When it Refused to Order a New
     Trial on Counts One, Five and Six after Granting Rule 29
     Motions as to Counts Nine, Ten and Eleven  . . . . . . 46

     A.   Standard of Review  . . . . . . . . . . . . . . . 46

     B.   Argument  . . . . . . . . . . . . . . . . . . . . 47

     1.   The District Court Erred When it Denied Mr. El
          Sayedri and Ms. Sabar's Motions to Sever Counts
          Nine, Ten and Eleven on the Grounds of Improper
          Joinder . . . . . . . . . . . . . . . . . . . . 47

     2.   The District Court Erred When it Refused to Order
          a New Trial on Counts One, Five and Six after
          Granting Rule 29 Motions as to Counts Nine, Ten

and Eleven Which Caused Prejudicial Spillover into
the Pool of Evidence Appropriately Before the Jury
as to Counts One, Five and Six . . . . . . . 52

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 56

REQUEST FOR ORAL ARGUMENT . . . . . . . . . . . . . . . 56

CERTIFICATE OF COMPLIANCE WITH TYPEFACE
    AND LENGTH LIMITATIONS . . . . . . . . . . . . . . 58

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . 59

## TABLE OF AUTHORITIES

### CASES

*Adamo Wrecking Co. v. United States*,
    434 U.S. 275 (1978).......................................32

*Baharon v. Holder*,
    588 F.3d 228 (4th Cir. 2009)..............................34

*Direct Sales Co. v. United States*,
    319 U.S. 703 (1943).......................................41

*Estelle v. McGuire*,
    502 U.S. 62 (1991)........................................35

*Harris v. United States*,
    272 F.2d 478 (4th Cir. 1959)..........................21, 22

*Jackson v. Virginia*,
    443 U.S. 307 (1979).......................................16

*Kotteakos v. United States*,
    328 U.S. 750 (1946)....................................23-24

*Mathews v. United States*,
    485 U.S. 58 (1988)........................................35

*Rewis v. United States*,
    401 U.S. 808 (1971).......................................32

*Smith v. United States*,
    133 S. Ct. 714 (2013).....................................23

*Tassi v. Holder*,
    660 F.3d 710 (4th Cir. 2011)..............................34

*United States v. Bass*,
    404 U.S. 336 (1971).......................................32

*United States v. Bonner*,
    648 F.3d 209 (4th Cir. 2011)..........................17, 55

*United States v. Burgos*,
    94 F.3d 849 (4th Cir. 1996)...............................41

iv

*United States v. Cardwell*,
    433 F.3d 378 (4th Cir. 2005)...........................48, 49

*United States v. Cheek*,
    94 F.3d 136 (4th Cir. 1996)...............................17

*United States v. Cross*,
    308 F.3d 308 (3d Cir. 2002)...............................53

*United States v. Daniels*,
    973 F.2d 272 (4th Cir. 1992)..........................26, 35

*United States v. Fearn*,
    589 F.2d 1316 (7th Cir. 1978)............................17

*United States v. Foutz*,
    540 F.2d 733 (4th Cir. 1976)..........................50, 51

*United States v. Gambone*,
    314 F.3d 163 (3d Cir. 2003)...............................53

*United States v. Griffin*,
    684 F.3d 691 (7th Cir. 2012)..............................17

*United States v. Hawkins*,
    589 F.3d 694 (4th Cir. 2009)..............................51

*United States v. Hines*,
    717 F.2d 1481 (4th Cir. 1983), *cert. denied,* 467 U.S. 1214
    (1984)....................................................43

*United States v. Jackson*,
    757 F.2d 1486 (4th Cir. 1985)............................44

*United States v. James*,
    590 F.2d 575 (5th Cir.), *cert. denied,* 442 U.S. 917
    (1979)....................................................42

*United States v. Jennings*,
    438 F. Supp. 2d 637 (E.D. Va. 2006).......................54

*United States v. Johnson*,
    592 F.3d 749 (7th Cir. 2010).............................18

*United States v. Kingrea*,
    573 F.3d 186 (4th Cir. 2009)..........................26, 35

*United States V. Mackins*,
   315 F.3d 399 (4th Cir. 2003).........................48, 49, 50

*United States v. Martinez*,
   763 F.2d 1297 (11th Cir. 1985).............................55

*United States v. Medford*,
   661 F.3d 746 (4th Cir. 2011)............................46-47

*United States v. Mills*,
   2014 U.S. App. LEXIS 2998 (4th Cir. Va. Feb. 19, 2014).....41

*United States v. Mir*,
   525 F.3d 351 (4th Cir. 2008)...............................48

*United States v. Mitchell*,
   602 F.2d 636 (4th Cir. 1979)...............................54

*United States v. Murphy*,
   323 F.3d 102 (3d Cir. 2003)................................53

*United States v. Pelullo*,
   14 F.3d 881 (3d Cir. 1994).............................52, 53

*United States v. Prescott*,
   221 F.3d 686 (4th Cir. 2000)...............................54

*United States v. Queen*,
   132 F.3d 991 (4th Cir. 1997), *cert. denied*, 523 U.S. 1101
   (1998).....................................................19

*United States v. Richardson*,
   161 F.3d 728, 733 (D.C.Cir. 1998) .........................50

*United States v. Robinson*,
   627 F.3d 941 (4th Cir. 2010)...............................41

*United States v. Rusher*,
   966 F.2d 868 (4th Cir. 1992)...............................47

*United States v. Singh*,
   261 F.3d 530 (5th Cir. 2001)...............................49

*United States v. Smith*,
   331 U.S. 469 (1947)........................................54

vi

*United States v. Steel*,
   674 F.2d 284 (4th Cir. 1982)................................16

*United States v. Stroupe*,
   538 F.2d 1063 (4th Cir. 1976)............................44

*United States v. Tresvant*,
   677 F.2d 1018 (4th Cir. 1982)............................40

*United States v. Vicaria*,
   12 F.3d 195 (11th Cir. 1994).............................55

## STATUTES & RULES

8 U.S.C. § 1324...........................................3
18 U.S.C. § 371........................................2, 47
18 U.S.C. § 1001....................................3, 35, 47
18 U.S.C. § 1028A.....................................3, 48
18 U.S.C. § 1543.....................................*Passim*
18 U.S.C. § 1546(a)...............................3, 24, 45
18 U.S.C. § 3231..........................................1
28 U.S.C. § 1291..........................................1
42 U.S.C. § 1437.........................................48


Fed. R. Crim. P. 8.......................................49
Fed. R. Crim. P. 8(a)........................47, 48, 50, 52
Fed. R. Crim. P. 14......................................47
Fed. R. Crim. P. 29 (a)..................................17
Fed. R. Crim. P. 33......................................56
Fed. R. Crim. P. 33(a)...................................54
Fed. R. Evid. 403........................................52
Fed. R. Evid. 404....................................52, 55

## OTHER AUTHORITIES

3 Wright & Miller, Federal Prac. & Proc. § 556 (1982).........54

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

RECORD NOs. 13-4747(L), 13-4761

---

UNITED STATES OF AMERICA,

APPELLEE,

v.

YOUNIS EL SAYEDRI,

AND

RUNEEN SABAR,

APPELLANTS.

On Appeal from the United States District Court
for the Eastern District of Virginia
Alexandria Division

---

**BRIEF OF APPELLANTS**

---

**JURISDICTIONAL STATEMENT**

The district court had jurisdiction over this case pursuant to 18 U.S.C. § 3231. The Fourth Circuit Court of Appeals has jurisdiction pursuant to 28 U.S.C. § 1291.

On June 27, 2012, the grand jury indicted Younis El Sayedri and Runeen Sabar. Joint Appendix (JA) 5. On August 23, 2012, the grand jury returned a Superseding Indictment. JA 6. On January 24, 2013, the grand jury returned the Second Superseding Indictment

1

on which Mr. El Sayedri and Ms. Sabar were tried commencing May 13, 2013. JA 73. They were sentenced on October 1, 2013. JA 1910-1947. Mr. El Sayedri and Ms. Sabar timely noted appeals on October 2, 2013, and October 4, 2013, respectively. JA 1948, 1950.

### STATEMENT OF ISSUES

I.   The District Court Erred When it Denied Rule 29 Motions as to Counts One, Five and Six

　　　1.   The District Court Erred When it Denied Mr. El Sayedri and Ms. Sabar's Rule 29 Motions to Dismiss Count One 17

　　　2.   The District Court Erred When it Denied Mr. El Sayedri's Rule 29 Motion to Dismiss Count Five

　　　3.   The District Court Erred When it Denied Mr. El Sayedri's Rule 29 Motion to Dismiss Count Six

II.  The District Court Should Have Granted Mr. El Sayedri and Ms. Sabar's' Motions for a Mistrial on Count One Because the Government Failed to "Connect-up" the Conspiracy by Evidence Independent of the Co-Conspirator Hearsay Statements

III. The District Court Erred When it Failed to Sever Counts Nine, Ten and Eleven and When it Refused to Order a New Trial on Counts One, Five and Six after Granting Rule 29 Motions as to Counts Nine, Ten and Eleven

### STATEMENT OF THE CASE

Count One of the Second Superseding Indictment charged Mr. El Sayedri, Ms. Sabar and Almahadi Ali with Conspiracy to Commit Immigration Document Fraud, in violation of 18 U.S.C. §§ 371, 2. Mr. Ali was charged in Count One only. The district court granted his Rule 29 motion at the conclusion of the government's case-in-chief. JA 1278-1283.

Counts Two, Three and Four charged Ms. Sabar with Immigration

2

Document Fraud, in violation of 18 U.S.C. § 1546(a). Counts Two and Four were dismissed without prejudice by the district court on the government's motion on May 7, 2013. JA 219. The district court granted Ms. Sabar's Rule 29 motion as to Count Three on May 16, 2013. JA 62.

Count Five charged Mr. El Sayedri with Passport Forgery in violation of 18 U.S.C. § 1543.

Count Six charged Mr. El Sayedri with False Statements in violation of 18 U.S.C. § 1001.

Counts Seven and Eight charged Mr. El Sayedri and Ms. Sabar, respectively, with Encouraging and Inducing an Alien to Live in the United States, in violation of 8 U.S.C. § 1324. These counts were dismissed without prejudice by the district court on the government's motion on May 7, 2013. JA 219.

Counts Nine, Ten and Eleven charged Mr. El Sayedri and Ms. Sabar with Aggravated Identify Theft, in violation of 18 U.S.C. §§ 1028A, 2.

Finally, the Second Superseding Indictment contained a forfeiture count which the government withdrew on May 16, 2013. JA 1478.

On April 19, 2013, Mr. El Sayedri and Ms. Sabar moved the district court to sever Counts Nine, Ten and Eleven on the grounds of improper joinder. JA 97, 117. The district court denied the motion. JA 215. Ultimately, the district court granted Rule 29

3

motions as to these counts.  JA 1862.

Mr. El Sayedri and Ms. Sabar moved the district court to for a *James* hearing to require the government to first establish the existence of a conspiracy joined by each defendant at the time of any alleged co-conspirator hearsay was made, as an evidentiary foundation for the admission of such co-conspirator hearsay at trial.  JA 110, 130.  The district court denied this motion.  JA 211.

Incident to this issue of co-conspirator hearsay, Mr. El Sayedri and Ms. Sabar moved for a Bill of Particulars. JA 106, 126. In response the district court ordered the government to identify all unindicted co-conspirators at least ten days in advance of trial. JA 211.  The government identified no other co-conspirators. JA 178.

Trial commenced on May 13, 2013.  As to Count One the government proceeded on the theory that between December 2000 and January 24, 2013, when the grand jury returned the Second Superseding Indictment, Mr. El Sayedri and Ms. Sabar, conspired with each other and with Mr. Ali to commit immigration document fraud.

As to Mr. El Sayedri, the government's evidence revealed he entered the United States in August 2000. JA 2014. On December 28, 2000, he filed an asylum application in which he represented he

married his wife, "AGA," on July 25, 1997.[1] *Id.* On December 31, 2002, he sought permanent resident status based on his already approved asylum status, representing his wife was Ariej Gowda Ali. JA 2009. On February 14, 2003, he filed an asylee relative petition for Ariej Gowda Ali, which would allow her to join him as his spouse. JA 2105.

On July 7, 2003, Mr. El Sayedri, using the name "Younis Abdel Karim Mohamed Badri," also filed a refugee application in Canada, listing Ms. Sabar as his wife.[2] GE 48d. On December 5, 2003, Mr. El Sayedri, using the name "Younis Abdel Karim Mohamed Badri," filed a permanent residence application in Canada, again listing Ms. Sabar as his wife. JA 2119.

As to Ms. Sabar, the government's evidence revealed that on February 28, 2005, Ms. Sabar entered the United States on the asylee relative petition approved for Ariej Gowda Ali.[3] In December of 2005, Ms. Sabar gave birth to her first of two children with Mr. El Sayedri. JA 2303. On September 5, 2006, Ms. Sabar filed an asylum application in her own name which represented that

---

[1] The evidence at trial revealed this was his first wife, Ariej Gowda Ali, whom he married in 1997 in Sudan. JA 1311.

[2] Mr. El Sayedri, a Muslim, married Ms. Sabar in 2003, at the insistence of his family when it became clear that Ariej Gowda Ali was unable to conceive a child. JA 1186.

[3] Mr. El Sayedri did not know that Ms. Sabar had taken Ariej Gowda Ali's place on the flight from Sudan to escape political persecution. JA 1190.

her most recent entry to the United States from Sudan was on May 25, 2006, and that she married her husband, Mr. Ali, on August 6, 2005. JA 2076.  Ms. Sabar listed no other entries into the U.S., nor did she list any children on her application.  *Id*.  In July 2007, Ms. Sabar gave birth to her second child with Mr. El Sayedri. JA 2300.  On September 12, 2007, Ms. Sabar filed an asylee relative petition for Mr. Ali, her husband.  On September 25, 2008, Ms. Sabar filed an application for permanent resident status based on her approved asylum status. JA 2067. In this application, Ms. Sabar did not list the two children that she had with Mr. El Sayedri and again identified Mr. Ali as her husband. *Id*. On June 16, 2005, Ms. Sabar filed a permanent resident application in Canada. JA 2154. Ms. Sabar's husband was listed as "Younis Badri." *Id*. On May 20, 2009, Ms. Sabar filed another permanent resident application in Canada. JA 2142. She listed her husband as "Younis Badri" and included a copy of a marriage contract, JA 2151, wedding photos, JA 2134, and the birth certificates of two children who were born in the United States in 2005 and 2007. JA 2149.[4]  On April 29, 2013, Ms. Sabar filed a naturalization application with the United

---

[4]    During their case-in-chief, the government offered and the district court admitted, over defense objection, documents from Ms. Sabar's Canadian immigration file. JA 686-696.  However, after the close of all the evidence, the district court specifically ruled that Ms. Sabar's Canadian immigration documents were not admissible as evidence *in furtherance of* the conspiracy.  The district court allowed government exhibits 49a-I to be admitted as probative of Ms. Sabar's knowledge of Mr. El Sayedri and their relationship. JA 1578.

States. JA 2311.  Ms. Sabar listed her marriage and divorce to Mr. El Sayedri and also listed their two children. *Id*.

The government offered evidence Mr. Ali entered the United States on January 22, 2009, as a result of Ms. Sabar's petition for an alien relative.[5] He filed an application for permanent evidence status the next year, in which he identified his wife as Ms. Sabar.[6]

United States Citizenship and Immigration Services (USCIS) asylum officer Christopher Gossett testified about the purpose, use, and requirements of the specific forms and petitions referenced above. JA 785-880.  These forms and petitions were kept in U.S. immigration files, also known as alien files or A-files. JA 790. Each A-file was associated with an individual, by name and a unique identification number known as an A-number. *Id*. Officer Gossett identified the A-files for Mr. El Sayedri, Ms. Sabar, and Ariej Gowda Ali and discussed various forms and petitions contained in each. JA 795-862.

As to Count Five, the government's evidence revealed that on

---

[5]  Although this fact was proven to the jury through the admission of GE 44e, after Mr. Ali's Rule 29 motion was granted, this exhibit was withdrawn from the exhibits that went back to the jury.

[6]  Mr. Ali's entire A-file was admitted and published to the jury.  GE 44 and JA 833-849. After granting Mr. Ali's Rule 29 motion, the district court attempted to minimize this damage by striking the A-file and excluding it from the jury's consideration. JA 1578.

December 30, 2011, Mr. El Sayedri attempted to board a flight from Edmonton, Canada, to Los Angeles. JA 2236. After checking his luggage, completing a customs declaration form, and going through security, Mr. El Sayedri presented his U.S. permanent resident card, boarding pass, and customs declaration to Customs and Border Protection (CBP) Officer Christine Levean at primary inspection. JA 2235-2236. Officer Levean testified primary inspection officers inspected individuals seeking to enter the United States to ensure they were eligible to come to the United States and have the necessary paperwork, including travel documents, boarding pass, and customs declaration. JA 932-969. After he presented his presented his U.S. permanent resident card, boarding pass, and customs declaration, Officer Levean asked Mr. El Sayedri if he had a passport. He presented a passport from the Republic of Sudan bearing number B0200015. JA 2186. Officer Levean placed Mr. El Sayedri in secondary processing where various identity documents were found inside of Mr. El Sayedri's shoe, including a Canadian permanent resident card and an Alberta Drivers License. JA 2237. The CBP allowed Mr. El Sayedri to fly to the United States, but deferred his inspection and instructed him to appear at Dulles Airport on February 28, 2012, for his deferred inspection interview.

Forensic document examiner Carolyn Bayer-Broring testified she examined the passport Mr. El Sayedri presented in Edmonton. It

revealed alterations on three pages of the passport. First, there was fiber disturbance on the upper left hand corner of the inside front cover of the passport, which was not under laminate, which suggested someone had tried to remove an impression made on the passport. JA 2222-2223. A spot light examination revealed an eradicated "CANCELLED" stamp impression in the area of the fiber disturbance. JA 2224. Second, page one of the passport, which was under laminate, showed fiber disturbance in the letter "s" in the name "ELSADRI." JA 2226-2228. Third, page two of the passport, which was not under laminate, had two areas of opaquing fluid, also known as "whiteout," with writing over the whiteout. JA 2230-2232.

As to Count Six, the government's evidence revealed that on February 28, 2012, Mr. El Sayedri reported to his deferred inspections interview at Dulles Airport. Officer Stunkle and Homeland Security Investigations (HSI) Special Agent Kelly Baird testified that the purpose of the deferred inspections interview was to determine Mr. El Sayedri's identity and status. During his interview, Mr. El Sayedri stated, in relevant part: (1) that his true and complete name was Younis El Sayedri and he only used the name "Younis Badri" one time, namely to travel to Sudan; (2) that he only had one wife, her name was Ariej Gowda Ali, and that she was raising the two children that Mr. El Sayedri had with Ms. Sabar; and (3) that he did not have a relationship with Ms. Sabar. JA 2245. When shown U.S. passport applications for his two sons,

9

JA 2176, 2181, Mr. El Sayedri affirmed that they were his sons. JA 2245.

Lukisha Rogers testified she married Mr. El Sayedri in Baltimore on May 31, 2002. She stated they never divorced. Ms. Roger offered no testimony concerning any contact with Mr. El Sayedri after 2002. JA 999-1004.

Baltimore County Clerk, Charles Mackey, testified that he performed the marriage ceremony marrying Ms. Rogers and Mr. El Sayedri. JA 994-997. Mr. Mackey identified the marriage certificate that was found in the Mr. El Sayedri's residence as the marriage certificate. JA 2298.

The government rested its case-in-chief on May 15, 2013. JA 1211. Mr. El Sayedri, Ms. Sabar and Mr. Ali argued Rule 29 Motions. The district court granted Mr. Ali's Rule 29 motion. JA 1283. The district court reserved ruling on the remaining Rule 29 motions as to Mr. El Sayedri and Ms. Sabar, but noted its "substantial concerns as to the sufficiency of the evidence as to a number of the claims." JA 1283.

Mr. El Sayedri called his brother, Noh Badri, as his witness. JA 1307-1357. He testified Mr. El Sayedri was born in Sudan in 1954. JA 1308. In 1997, he married his first wife, Ariej Gowda Ali. JA 1311. She was his wife of choice. JA 1313. He was a Nubian, an ethnic group discriminated against in Sudan. JA 1308-09. Mr. El Sayedri was a political activist who had been arrested

and tortured. JA 1309-10. As a consequence, he fled Sudan to Saudi Arabia, without his wife, in the late 1990's and arrived, alone, in the United States in 2000, where he successfully sought asylum. JA 1313. Mr. El Sayedri and his wife had been unable to conceive a child, which was very important to his community. JA 1313-14. In 2002, without Mr. El Sayedri's consent or knowledge, one of his brothers initiated divorce proceedings against his wife, Ariej Gowda Ali. JA 1316. The family reached a compromise. In 2003 the family arranged a second marriage for Mr. El Sayedri to Ms. Sabar, who was a young and, hopefully, fertile woman. JA 1317. In exchange, the family agreed to drop efforts to pursue the divorce against Ariej Gowda Ali. JA 1318. In 2003, Mr. El Sayedri left the United States to meet his new wife, Ms. Sabar, at a wedding ceremony in Damascus, Syria. JA 1318. She was a 20-year-old university student in Khartoum, thirty years younger than he. After the ceremony, Mr. El Sayedri returned to the United States. Ms. Sabar returned to Sudan. JA 1319. By early 2005, Mr. El Sayedri had finally made arrangements to bring his first wife, Ariej Gowda Ali, to the United States under derivative asylee status. JA 1320. Meanwhile, back in Sudan, his second wife, Ms. Sabar, a stranger to him, had become politically active. She also had been arrested. JA 1319. Concerned for her safety, her family sought a way to get her out of Sudan. JA 1320. Unaware of these unfolding events, Mr. El Sayedri, waited at Dulles Airport in

11

February 2005 for the arrival of his first wife, Ariej Gowda Ali. The family, however, surreptitiously had substituted Ms. Sabar to travel in Ariej Gowda Ali's place, to secure Ms. Sabar's safety. JA 1321.  When Ms. Sabar appeared at the airport, Mr. El Sayedri was understandably disappointed and upset.  JA 1322.  By May 2005, Mr. El Sayedri arranged for Ms. Sabar's return to Sudan and for the arrival of his first wife, Ariej Gowda Ali.  JA 1321-22, 1326. Noh Badri took Ms. Sabar to the airport to return her to Sudan in May of 2005.  JA 1343.  Though no one realized it when she was sent back to Sudan, Ms. Sabar was pregnant.  Mr. El Sayedri arranged a divorce from Ms. Sabar shortly after her arrival back in Sudan. JA 1342.  Soon  after, Ariej Gowda Ali arrived in the United States as the rightful holder of derivative asylee status.  Meanwhile, in August 2005, five months pregnant and divorced from Mr. El Sayedri, Ms. Sabar's family quickly arranged for her marriage to her first cousin, Mr. Ali, in Sudan. JA 1325.  In fact, Mr. Ali's mother and Ms. Sabar's mothers were twin sisters and their fathers were brothers.  JA 1356.  In October 2005, now seven months pregnant, Ms. Sabar engineered her surprise return to the United States.  JA 1326. Her arrival was not well received, especially by Ariej Gowda Ali, who was then living with  Mr. El Sayedri and still unable to conceive a child. JA 1326.  Nevertheless, Ms. Sabar remained with them under one roof.  The child was born in December 2005. JA 1326-27.  In January 2006, Mr. El Sayedri forced Ms. Sabar to return a

second time to Sudan, while the child remained with him and Ariej Gowda Ali. JA 1328. Four months later, in May 2006, Ms. Sabar arrived in the United States for a third time, now determined to reclaim her infant son. JA 1328-29. She moved in with Mr. El Sayedri. JA 1329-30. Eventually their union produced a second son. JA 1332. Shortly after Mr. El Sayedri's marriage to Lukisha Rogers in May 2002, the Rogers family refused to take calls from Mr. El Sayedri. Ms. Rogers' mother told Noh Badri that Ms. Rogers had been killed in an auto accident. Noh Badri conveyed this information to Mr. El Sayedri. JA 1585-1587.

James Roberts, an immigration attorney, testified that he prepared various immigration filings on behalf of Ms. Sabar. JA 1359. In fact, part of the N-400 application for naturalization that he filed included a divorce decree, showing Mr. El Sayedri and Ms. Sabar were divorced. JA 1360, 2447. Ms. Sabar also listed her children on this application. JA 2311. Mr. Roberts also prepared the asylum application for Ms. Sabar. JA 1364. In the 22 years that Mr. Roberts has been preparing asylum applications, he testified that people very frequently misunderstand the application questions. JA 1368-69. Even questions which appear to be simple, i.e., "Do you have children?" are misunderstood by applicants who want to know if the question is asking if they have children here in the United States? JA 1369. The asylum application asks, "When did you leave your country?" "List each entry to the U.S.

13

beginning with your most recent entry." JA 1369. Mr. Roberts testified that it is the most recent entry which is important because an applicant has to apply for asylum within one year of the most recent entry. JA 1369. Mr. Roberts also testified that "many, many, many people" enter the U.S. with false documents because they are fleeing their country. JA 1370. That fact, alone, is not enough to deny an applicant asylum. JA 1370-71.

Another immigration attorney, Eileen Blessinger, testified on behalf of the defense. Ms. Blessinger explained that if the basis for the asylum application was political persecution (as was the case here), and not a particular family relationship, then parental and spousal relationships were not material to the application. JA 1376-77. Similarly, the American children of the applicant could be omitted from the I-485, the adjustment of status application. They were not material to this application. JA 1376. Ms. Blessinger also stated that Mr. El Sayedri's statements at the deferred inspection regarding: 1) using the name Younis Badri only one time to travel to Sudan, and 2) that he had only one wife, Ariej Gowda Ali, and 3) that he did not have a relationship with Runeen Sabar, were not material to the deferred inspection. JA 1378. A deferred inspection was intended to confirm the person was admissible at the time of entry. These questions were irrelevant to that inquiry. JA 1378.

Mr. El Sayedri also offered defense exhibit 14, a certificate

14

from the Embassy of Sudan, which included a copy of the passport with the alterations, and which attested the passport Mr. El Sayedri possessed in Edmonton was a valid passport and was not altered by any person other than an officer of the Embassy of Sudan. JA 1396, 2455.

The district court had granted Ms. Sabar's Rule 29 motion as to Count Three on May 16, 2013. JA 62. At the conclusion of all evidence Mr. El Sayedri and Ms. Sabar renewed their Rule 29 motions on the remaining charges, Counts One, Five, Six, Nine, Ten and Eleven. JA 1444, 1494. The district court took the motions under advisement. On May 21, 2013, the jury returned guilty verdicts on Counts One, Five, Six, Nine, Ten and Eleven. JA 63-64. On June 17, 2013, the district court granted the Rule 29 motions as to Counts Nine, Ten and Eleven. JA 1862. The district court denied the Rule 29 motion as to Count One. The district court invited further argument on Counts Five and Six and took under advisement whether a new trial should be ordered as to Count One, pending its rulings on Counts Five and Six. JA 1862. On June 24, both Mr. El Sayedri and Ms. Sabar submitted a joint motion for a new trial. Mr. El Sayedri submitted additional argument on his Rule 29 motions as to Counts Five and Six. JA 1864. On July 3, 2013, the district court denied the Rule 29 motions as to Counts Five and Six and the motion for a new trial. JA 1899.

15

## SUMMARY OF THE ARGUMENT

Mr. El Sayedri and Ms. Sabar moved the district court dismiss Count One on the grounds the evidence failed to prove they conspired with each other, and if so, during any time period even close to the alleged start date of the conspiracy.

Mr. El Sayedri moved the district court to dismiss Count Five on the grounds Count Five failed to state an offense and to dismiss both Counts Five and Six on the grounds they were not supported by the evidence.

Mr. El Sayedri and Ms. Sabar also moved the district court to dismiss Count One because the government failed to "connect-up" the conspiracy by evidence independent of alleged co-conspirator hearsay statements and because of prejudicial spillover evidence from Counts Nine, Ten and Eleven which the district court refused to sever, only to grant their motion under Rule 29 as to Counts Nine, Ten and Eleven at the close of all evidence.

## ARGUMENT

I. **The District Court Erred When it Denied Rule 29 Motions as to Counts One, Five and Six**

A. **Standard of Review**

I. The sufficiency of evidence is considered in the light most favorable to the government. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *United States v. Steel*, 674 F.2d 284, 286 (4th Cir. 1982). Questions of law (whether Count Five stated an

16

offense, are reviewed de novo. *United States v. Cheek*, 94 F.3d 136 (4th Cir. 1996).

## B.  Argument

"The court on the defendant's motion ***must*** enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29 (a) (emphasis added). The district court erred when it denied Mr. El Sayedri and Ms. Sabar's Rule 29 motions.

On such a motion, a court inquires whether the evidence allows "a rational trier of fact" to "have found the essential elements of the charged offense beyond a reasonable doubt."  *United States v. Bonner*, 648 F.3d 209, 213 (4th Cir. 2011).  The court must guard against a conviction that is based on evidence "so scant that the jury could only speculate as to the defendant's guilt, and is such that a reasonably-minded jury must have a reasonable doubt as to the defendant's guilt."  *United States v. Fearn*, 589 F.2d 1316, 1321 (7th Cir. 1978); accord *Bonner*, 648 F.3d at 214 (explaining that, while a court is required to view "conflicting evidence and credibility" in the government's favor, it is "impermissible" to allow "juries to invent new evidence based on unsubstantiated" speculation). "A jury cannot speculate its way out of reasonable doubt."  *United States v. Griffin*, 684 F.3d 691, 698-99 (7th Cir. 2012).

Although  a  court  must  view  "conflicting  evidence  and

17

credibility in favor" of the government, it is "impermissible" to resolve equally competing inferences in the government's favor. *Bonner,* at 214. Where competing inferences are in "equipoise" — where "the plausibility of each inference is about the same" — a reasonable "jury necessarily would have to entertain a reasonable doubt." *United States v. Johnson*, 592 F.3d 749, 755 (7th Cir. 2010).

With these principles in mind a review of the evidence compels the conclusion the Rule 29 motions should have been granted as to Counts One, Five and Six.

> **1. The District Court Erred When it Denied Mr. El Sayedri and Ms. Sabar's Rule 29 Motions to Dismiss Count One**
>
> > **i. The Evidence as to Count One Failed to Show Mr. El Sayedri and Ms. Sabar Conspired with Each Other and with Mr. Ali Before 2005, Which Was Five Years after the Alleged Start of the Conspiracy, and the Evidence Reveals That in 2005 Mr. El Sayedri and Ms. Sabar, Rather than Conspire with Each Other to Achieve Alleged Goals of the Conspiracy, Actually Were Working at Cross Purposes in Opposition to Each Other's Goals**

The evidence failed to establish any conspiracy commenced in 2000, as alleged in the Second Superseding Indictment, with the stated purpose "to obtain immigration benefits and admission into the United States for individuals who were not entitled to such benefits and admission, namely defendants RUNEEN SABAR and ALMAHADI ALI." JA 77. In fact, when the evidence finally revealed contact

18

between Mr. El Sayedri and Ms. Sabar in the United States in 2005, far from acting in concert with each other as co-conspirators for the purpose of obtaining immigration benefits and admission into the United States for Ms. Sabar, Mr. El Sayedri did everything he could to eject Ms. Sabar from the United States, while Ms. Sabar did everything she could to return to, and remain in, the United States.

In *United States v. Queen,* 132 F.3d 991 (4th Cir. 1997), *cert. denied*, 523 U.S. 1101 (1998), this Court held that "the starting date of a conspiracy [need not] coincide with the starting date alleged in the indictment . . . so long as the time frame alleged places the defendant sufficiently on notice of the acts with which he is charged." *Id.* at 999. This Court approved the following instruction:

> The charges that are set out in the indictment regarding the conspiracy count, indicate that the offense was committed on or about a certain date or dates, but the proof need not establish with certainty the exact date of the alleged offense. It is sufficient if the evidence establishes beyond a reasonable doubt the offense was committed on a date **reasonably** near the date alleged.

*Id.* at footnote 5 (emphasis provided). True, the indictment alleged overt acts occurring between 2000 and 2005. But the mere recitation of alleged overt acts does not establish these acts were committed within the scope of a conspiracy for the purpose of advancing the goals of the conspiracy, during a time reasonably near the date alleged in the indictment.

19

In fact, these "overt acts" were neither committed within the scope of a conspiracy, nor did they advance the stated purpose of the conspiracy.

Mr. El Sayedri arrived in the United States in August 2000. Soon after, he filed an asylum application in which he represented his wife was Ariej Gowda Ali, not Ms. Sabar. On December 23, 2002, he sought permanent resident status based on his already approved asylum status, again representing his wife was Ariej Gowda Ali, not Ms. Sabar. On February 14, 2003, he filed an asylee relative petition for Ariej Gowda Ali, not Ms. Sabar, which would allow Ariej Gowda Ali, not Ms. Sabar, to join Mr. El Sayedri in the United States.

Meanwhile, the government's evidence also showed that on July 7, 2003, Mr. El Sayedri, using the name "Younis Abdel Karim Mohamed Badri," filed a refugee application *in Canada*, not in the United States, in which he listed Ms. Sabar, by then his second wife, as his wife. Arguably, Mr. El Sayedri, may have been vulnerable to prosecution in Canada due to the Canadian application, but this had nothing to do with a conspiracy to acquire immigration benefits for Mr. Sabar *in the United States*, and nothing he did through 2005, or beyond for that matter, ever advanced the stated goal of acquiring immigration benefits for Ms. Sabar *in the United States*, as alleged.

When Ms. Sabar arrived unannounced in the United States in

20

February 2005, using Ariej Gowda Ali's derivative asylee status to flee arrest in Sudan because of her political activism, Mr. El Sayedri, far from attempting to obtain immigration benefits for her, actually had her thrown out of the country in May 2005.  In October 2005 when she returned, again unannounced, and this time seven months pregnant, Mr. El Sayedri again forced her to leave the United States in January 2006, without her newborn.  Finally, Ms. Sabar returned a third time, again over his objection, later in 2006.  When he confirmed his paternity of Ms. Sabar's child, it triggered the demise of Mr. El Sayedri's marriage to the women he loved, Ariej Gowda Ali.  JA 1330-1331.  Ms. Sabar's efforts are bereft of any evidence there was a conspiracy between Mr. El Sayedri and Ms. Sabar and that any of her actions, as well, advanced any such agreement between Mr. El Sayedri and Ms. Sabar to obtain immigration benefits for Ms. Sabar in the United States.  If the record reveals anything it reveals two people with goals and aspirations in constant opposition.

*Harris v. United States*, 272 F.2d 478 (4th Cir. 1959) is instructive.  In *Harris,* this Court approved limiting the jury's ability to find a conspiracy because of a lack of evidence to support the alleged start date of the conspiracy.  Though the indictment alleged the conspiracy commenced in November 1955, the district court correctly instructed the jury that it could find a conspiracy, if any, commencing only on or about January 1957

21

because of insufficient evidence to support the start of a conspiracy prior to that time. In *Harris,* this Court observed the defendant committed the acts alleged to be overt acts of the conspiracy. The Court, however, noted that insufficient. The Court drew the distinction between the mere commission of acts, which are described in an indictment as overt acts of a conspiracy, and the commission of acts, which genuinely qualify as overt acts of a conspiracy because they are coupled with the pre-existing decision to join a conspiracy:

> [P]roof of overt acts in themselves is not sufficient, for it must be established that the conspiracy or agreement which is charged to have existed and which is the gist of the offense **had been formed before and was existing at the time of the commission of the overt act or acts.**

*Id.* at 482 (emphasis provided).

The evidence as to Count One failed to show that if Mr. El Sayedri and Ms. Sabar conspired with each other at all, it was during any period reasonably close to the alleged start of the conspiracy in 2000. Further, the record reveals no contact between Mr. El Sayedri and the third alleged co-conspirator, Mr. Ali, who did not even arrive in the United States until January 22, 2009, when he attempted to reunite with his wife, Ms. Sabar, whom he had married in late 2005, unaware of her prior marriage and children by Mr. El Sayedri.

Nevertheless, the indictment alleged that in 2000 these three individuals, strangers to each other, then and there formed a

conspiracy to commit immigration document fraud to benefit Ms. Sabar and Mr. Ali, who would not even enter the United States for five more years and nine more years, respectively!  The district court granted Mr. Ali's Rule 29 motion at the conclusion of the government's case-in-chief.  This left only Mr. El Sayedri and Ms. Sabar to serve as co-conspirators.

A conspiracy requires two or more people to reach an agreement as to a criminal purpose.  *Smith v. United States*, 133 S. Ct. 714, 719 (2013)("To convict a defendant of . . . conspiracy, the Government must prove beyond a reasonable doubt that two or more people agreed to commit a crime covered by the specific conspiracy statute (that a conspiracy existed) and that the defendant knowingly and willfully participated in the agreement (that he was a member of the conspiracy.")).  Ms. Sabar was only a child, unknown to Mr. El Sayedri in 2000.  The evidence failed even to suggest the basis and necessary ingredient for a conspiracy until five years after the alleged inception of the conspiracy.  This variance of five years is fatal.

The evidence of overt acts which occurred prior to 2005 were ultimately inadmissible and prejudiced Mr. El Sayedri and Ms. Sabar because the government failed to establish the existence of a conspiracy which was the evidentiary foundation for the admissibility of this evidence.  A variance is fatal when it affects the substantial rights of the defendant.  *Kotteakos v.*

*United States*, 328 U.S. 750 (1946).

The record reveals no occasion when Mr. El Sayedri and Ms. Sabar ever acted in concert as co-conspirators to commit immigration document fraud in violation of 18 U.S.C. § 1546(a). The district court erred when it denied the Rule 29 motion on Count One on this basis.

> **ii.  The Government Neglected to Offer Evidence That Statements in the Applications, Affidavits, and Other Documents Were Material and Were Required by the Immigration Laws and Regulations Prescribed Thereunder**

Count One alleged immigration document fraud.  The government was required to prove Mr. El Sayedri and Ms. Sabar conspired to make under oath a false statement with respect to a ***material*** fact in an application, affidavit, and other document ***required*** by the immigration laws and regulations prescribed thereunder:

> From in or about December 2000, through and including the present, within the Eastern District of Virginia and elsewhere, the defendants, YOUNIS EL SAYEDRI, RUNEEN SABAR, and ALMAHADI ALI did knowingly and unlawfully combine, conspire, confederate and agree with each other, and others known and unknown to the Grand Jury, to commit an offense against the United States, to wit: knowingly to make under oath, and as permitted under penalty of perjury, and knowingly subscribe as true, **a false statement with respect to a material fact in an application**, affidavit, and other document **required by the immigration laws and regulations prescribed thereunder**, and knowingly to present an application containing any such false statement, in violation of 18 U.S.C. § 1546(a).

JA 77.  Count One, ¶ 2 (emphasis provided).

Count One alleged "the defendants . . . [made] . . .

materially false and fraudulent statements and representations regarding, among other things, marital and familial status and alleged dates and manners of entry into the United States." JA 77-78. Count One, ¶ 3. Count Three alleged that when Ms. Sabar filed the required Form 1-730 (Refugee/Asylee Relative Petition), she falsely claimed in regard to a material fact that she was married to Mr. Ali. JA 86. Count Four alleged Ms. Sabar filed a Form 1-485, Application to Register Permanent Residence, in which she materially omitted material information, namely that she had two children with Mr. El Sayedri. JA 87.

The government offered no testimony on the issue of the materiality of these statements. In contrast, Ms. Blessinger testified it was not material to omit a spouse or a child from the application for asylum or permanent residence in this case.

James Roberts, also an immigration attorney, testified that only the most recent entry into the United States was significant for the asylum application because the alien must apply for asylum within one year of the last entry. The government only claimed that Ms. Sabar omitted alleged material information by omitting her first two entries into the United States, and not for her most recent, final, entry. See JA 2076-2090. Count One should have been dismissed because the government failed to offer proof of materiality of any false statement.

In Count One the government was also required to prove the

25

subject of this conspiracy was a document ***required*** by the immigration laws or regulations prescribed thereunder. Though the government offered testimony from witness Christopher Gossett that the application, affidavits and other documents were important and useful to the government in detecting immigration fraud, this witness neglected to testify that any such document was ***required*** by immigration laws and regulations. Moreover, the government offered no notice of any expert who could offer an opinion the documents allegedly the subject of this conspiracy were ***required*** by immigration law or regulation. Neither did the government offer any evidence from any other source that the documents allegedly the subject of this conspiracy were ***required*** by immigration law or regulation. Count One should have been dismissed because the government failed to offer evidence any documents were *required* by the immigration laws and regulations.

### 2. The District Court Erred When it Denied Mr. El Sayedri's Rule 29 Motion to Dismiss Count Five

#### i. Count Five Failed to State an Offense

An indictment must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense. *United States v. Kingrea,* 573 F.3d 186 (4th Cir. 2009); *United States v. Daniels,* 973 F.2d 272, 274 (4th Cir. 1992).

Count Five alleged Mr. El Sayedri presented an altered passport

26

to gain entry into the United States in violation of 18 U.S.C. § 1543:

> 3.   On or about December 30, 2011, the defendant Mr. El Sayedri, while a resident of Reston, Virginia, within the Eastern District of Virginia, wilfully and knowingly presented an altered Republic of Sudan Passport, bearing number B2000015, in the name "Younis Abdelkarim Mohamed Elsadri" to an Officer of United States Customs and Border Protection in Edmonton, Canada, with the intent that said passport and instrument purporting to be a passport may be used to gain entry into the United States.

JA 88. 18 U.S.C. § 1543 contains two alternative parts for forgery or false use of a passport.  The first part targets the individual who falsely modifies a passport with the intent it be used in this modified condition:

> Whoever falsely makes, forges, counterfeits, mutilates, or alters any passport or instrument purporting to be a passport, with intent that the same may be used . . ., or

The second part targets the individual who knowingly uses this modified passport:

> Whoever willfully and knowingly uses, or attempts to use, or furnishes to another for use any such false, forged, counterfeited, mutilated, or altered passport or instrument purporting to be a passport, or any passport validly issued which has become void by the occurrence of any condition therein prescribed invalidating the same-

> Count Five borrowed elements from both parts of 18 U.S.C. § 1543, but failed to allege all of the elements of either part.

Of the three elements in the first part, Count Five alleged only the third element, illustrated by a comparison of Count Five and 18 U.S.C. § 1543:

27

3.    On or about December 30, 2011, the defendant Mr. El Sayedri, while a resident of Reston, Virginia, within the Eastern District of Virginia, wilfully and knowingly presented an altered Republic of Sudan Passport, bearing number B2000015, in the name "Younis Abdelkarim Mohamed Elsadri" to an Officer of United States Customs and Border Protection in Edmonton, Canada, **with the intent that said passport and instrument purporting to be a passport may be used to gain entry into the United States**.

18 U.S.C. § 1543 (first part):

1)    Whoever falsely makes, forges, counterfeits, mutilates, or alters

2)    any passport or instrument purporting to be a passport,

3)    **with intent that the same may be used . . .**

Mr. El Sayedri asserted Count Five was flawed, as to the second part, because it neglected to allege the passport "has become void," the third element of the second part. Of the three elements in the second part, Count Five alleged only the first two elements, illustrated by a comparison of Count Five and 18 U.S.C. § 1543:

3. On or about December 30, 2011, the defendant YOUNIS EL SAYEDRI, while a resident of Reston, Virginia, within the Eastern District of Virginia, **wilfully and knowingly presented an altered Republic of Sudan Passport**, bearing number B2000015, in the name "Younis Abdelkarim Mohamed Elsadri" to an Officer of United States Customs and Border Protection in Edmonton, Canada, with the intent that said passport and instrument purporting to be a passport may be used to gain entry into the United States.

18 U.S.C. § 1543 (second part):

1)    Whoever willfully and knowingly **uses [presents]**, or attempts to use, or furnishes to another for use

2)    any such false, forged, counterfeited, mutilated, or **altered passport** or instrument purporting to be a

28

passport, or any passport validly issued

3)    which has become void by the occurrence of any condition therein prescribed invalidating the same--

The district court held that the government was not required to prove every passport had been rendered void. Instead, the district court read the second part to contain two distinct prongs: 1) the passport was altered, or 2) that passport was made void by some occurrence prescribed therein. The district court's construction of the second part is illustrated by a comparison of Count Five and 18 U.S.C. § 1543 (second part):

> 3.    On or about December 30, 2011, the defendant Mr. El Sayedri, while a resident of Reston, Virginia, within the Eastern District of Virginia, **wilfully and knowingly presented an altered Republic of Sudan Passport**, bearing number B2000015, in the name "Younis Abdelkarim Mohamed Elsadri" to an Officer of United States Customs and Border Protection in Edmonton, Canada, with the intent that said passport and instrument purporting to be a passport may be used to gain entry into the United States.

18 U.S.C. § 1543 (second part):

1)    **Whoever willfully and knowingly uses,** or attempts to use, or furnishes to another for use

2)    a)    **any such** false, forged, counterfeited, mutilated, or **altered passport** or instrument purporting to be a passport,

       or

      b)    any passport validly issued which has become void by the occurrence of any condition therein prescribed invalidating the same-

The district court held that Count Five was adequately pled as to the first prong of the second part, that the passport was altered.

29

JA 1903.

At the post-trial hearing on June 17, 2013, the government agreed that it proceeded against Mr. El Sayedri under the second part. JA 1827. Having already brushed aside the argument Count Five neglected to allege the passport "had become void," the district court itself raised the question whether Count Five still failed to state an offense because the second part of 18 U.S.C. § 1543, borrowed from the first part in a manner not alleged in Count Five. Specifically, the district court asked whether the term "such" in the second part referred to the entire first part and if so, whether the term "falsely" in the first part required Count Five to allege, and the evidence prove, that the passport was ***falsely*** altered ***with the intent that it be used***. The government conceded that if this was the proper construction of 18 U.S.C. § 1543, Count Five failed because it neglected to so charge Mr. El Sayedri and because no evidence was offered on this issue. JA 1826-1833.

Ultimately, the district court held that construction of the statute, which it credited appeared to be of first impression, hinged on whether the term "such" in the second part should be read as an adjective or an adverb. JA 1900. Reading "such" as an adjective led to a more expansive construction of the statute that reached all altered passports. Reading "such" as an adverb compelled a more restrictive construction that only reached passports altered in the fashion or manner described in the first

part.  The district court erred when it concluded "such" should be read as an adjective:

> The Court concludes that reading "such" as an adjective is the more appropriate reading, even under the rule of lenity, so that Part II applies to any altered passport, not just those described under Part I.  Any other reading would import into Part II, by implication, additional elements that Congress did not expressly include, namely, an element based on the criminal intent of someone who could easily be a person other than the defendant, and who may not even be known to the defendant, or the government, even with respect to an obviously forged or altered passport that comes into a defendant's possession.  For this reason, by including the intent requirement of Part I into the offense described in Part II, the offense described in Part II could often become unprovable; and the Court should not assume that Congress intended to create such an offense, absent no other reasonable reading of Part II.

JA 1898, 1901-1902.

If "such" in the second part is meant to apply to **any** altered passport, and not just to those altered passports referred to in the first part of the statute, as the district court held, the statute could and should read "any altered passports."  Instead, it reads "such" altered passports.  In doing so, it refers specifically to those passports otherwise identified in the statute.

The district court's expansive construction of the term "such," which is not limited to passports which have been "falsely" altered, but which reaches *any* altered passports, produces odd and nonsensical results that could not have been intended by Congress.  Under the district court's construction, any person who uses an altered passport violates 18 U.S.C. § 1543, no matter how the

31

passport is altered, whether by a coffee stain, accidental tearing, or smearing.  That simply cannot be the intent of Congress.  The rule of lenity, if not rules of logic and common sense, compels the conclusion Congress meant to confront individuals who knowingly used *falsely altered* passports and had no interest in confronting individuals who presented passports with coffee stains. See *United States v. Bass*, 404 U.S. 336, 347 (1971)("ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity); See also, *Rewis v. United States*, 401 U.S. 808, 812 (1971); *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 284-285 (1978).

However, even if the district court is correct that Congress meant to criminalize the knowing use of *any* altered passport, to avoid the absurd result occasioned by the use of a passport with a coffee stain, the *materiality* of the alteration is an essential element of the offense which must be pled.  The government conceded the materiality requirement for any alteration at a hearing on May 13, 2013:

> THE COURT: In the government's view, what's the materiality of these alterations?
>
> MS. MARTINEZ: The materiality of the alterations, Your Honor, it is an element of the passport charge that has been charged, which is that the passport is altered.

JA 393-394.  Count Five, however, neglected to allege the materiality of any alteration.  Even under the district court's construction of the statute, that 18 U.S.C. § 1543 reaches *any*

32

altered passport, Count Five failed to allege an offense because it failed to allege materiality of the alteration as a necessary element.

The district court settled on this more expansive construction of the second part of 18 U.S.C. § 1543, that "such" was intended to reach **any** altered passport, however altered, because "the offense described in Part II could often become unprovable" if the district court allowed the less expansive construction of "such" in the second part of 18 U.S.C. § 1543.  JA 1901-1902.  True, the common sense construction of "such" could lead to instances where the government lacked sufficient evidence of the intent of the person who altered a passport.  Difficulty of prosecution, however, does not permit the district court to indulge in an interpretation of the statute that takes it beyond its stretching point, to include every instance of the use of any altered passport, no matter the intent of the person who altered the passport or the intent of the person who uses the passport.

The only viable reading of 18 U.S.C. § 1543 compels the conclusion the word "such" in the second part draws its meaning from the first part.  18 U.S.C. § 1543 required the government to allege by indictment and prove that Mr. El Sayedri knew that the passport he possessed and used had been materially altered and that when it was so altered it was done with the intent that it be used in such altered condition.  Because the government neither alleged this in

Count Five, nor proved this by evidence, the district court erred when it denied Mr. El Sayedri's Rule 29 motion as to Count Five.

### ii. The Evidence Clearly Established the Passport Was Not Falsely Altered

A jury may not arbitrarily disregard evidence. *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011); *Baharon v. Holder*, 588 F.3d 228, 233 (4th Cir. 2009).

Count Five, in pertinent part, charged:

2. On or before December 30, 2011, a Republic of Sudan passport bearing number B200015 was altered, to:

> a.   eradicate stamp impressions on the inside front cover and on page two;
>
> b.   eradicate a letter on page one; and
>
> c.   overwrite text on page two of the passport.

The unrefuted evidence revealed, however, that the passport which Mr. El Sayedri possessed on December 30, 2011, at the airport in Edmonton, Canada, was a valid passport in proper order and that that any changes to this passport were done by the Embassy of Sudan. The government asked the jury arbitrarily to disregard defense exhibit 14, the report for the Embassy of Sudan, which documented the passport in question was in good order and was not cancelled as of September 2012, when it was presented in Edmonton. True, the government was able to show the passport had been altered. The government was unable to offer any evidence the passport had been altered by anyone other than a representative of the government of

34

Sudan in his official capacity.  The government offered no reason to the jury for this suggestion other than the report did not fit with the government's theory of the case.  The only evidence directly addressing the integrity of the passport was defense exhibit 14, which established that it was a lawful and valid passport.  No reasonable juror could convict Mr. El Sayedri on Count Five without first arbitrarily disregarding defense exhibit 14, which stood unimpeached by the government.  Count Five should be dismissed.

### 3.  The District Court Erred When it Denied Mr. El Sayedri's Rule 29 Motion to Dismiss Count Six

The government is required to prove every element of an offense. *Estelle v. McGuire*, 502 U.S. 62 (1991); *Mathews v. United States*, 485 U.S. 58 (1988). *United States v. Kingrea*, supra; *United States v. Daniels*, supra.

18 U.S.C. § 1001, prohibits a materially false statement in any matter within the jurisdiction of the executive branch of the government, and in pertinent part, provides:

**18 U.S.C. § 1001. Statements or entries generally**

(a)  Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--

\*\*\*

(2)  makes any materially false, fictitious, or fraudulent statement or representation;

Count Six, which charged a violation of 18 U.S.C. § 1001, in

35

pertinent part, alleged:

> 2.   On or about February 28, 2012, in Loudoun County, within the Eastern District of Virginia, in a matter within the jurisdiction of the executive branch of the United States Government, the defendant, Mr. El Sayedri, did willfully and knowingly make and cause to be made materially false, fictitious, and fraudulent statements and representations to an Officer of U.S. Custom and Border Protection and to a Special Agent of U.S. Immigration and Customs Enforcement in connection with a criminal investigation involving immigration fraud, to wit: the defendant, Mr. El Sayedri stated, in substance and in part:
>
>> a.   Defendant Mr. El Sayedri only used the name "Younis Badri" one time, namely, to travel to Sudan;
>>
>> b.   Defendant Mr. El Sayedri has only one wife and her name is "AGA";
>>
>> c.   Defendant Mr. El Sayedri does not have a relationship with defendant Ms. Sabar.

JA 89.

Mr. El Sayedri submitted to an interview on February 28, 2012, at a deferred inspection at Dulles Airport.  During this interview the government offered evidence he made the three statements alleged in Count Six.  The government was requires to prove these statements were 1) false, 2) material and 3) were made in a matter within the jurisdiction of the executive branch of government.  The district court erred when it denied Mr. El Sayedri's Rule 29 motion as to Count Six.

### i.   The Evidence Was Insufficient to Establish the Statements Were False

Count Six alleged first that Mr. El Sayedri falsely asserted

he used the name Badri only once. Though the government provided an interpreter for the interview of Mr. Ali, the government neglected to do so for Mr. El Sayedri. Further, the interview took several hours, none of which was recorded. We have only the CBP officer in attendance at trial to reach the conclusion that Mr. El Sayedri said he used the name Badri ***only once*** when he traveled to Turkey, rather than, for example, that Mr. El Sayedri said he ***once used*** the name Badri when he traveled to Turkey. This brief description by the CBP officer of a single sentence in a very lengthy, unrecorded and untranslated interrogation, is insufficient to support Count Six that this statement was a "false" statement.

Next, Count Six asserted Mr. El Sayedri falsely stated he had only one wife. To support this part, Lukisha Rogers testified she married Mr. El Sayedri in 2002. The marriage trail ended as quickly as it began in 2002. Ms. Rogers offered no further contact with Mr. El Sayedri which would be relevant to Mr. El Sayedri's state of mind in 2012. In contrast, Noh Badri testified that he was told by Ms. Rogers' family shortly after the marriage that she had died in an auto accident and that he spoke with Mr. El Sayedri about this. Thus, Mr. El Sayedri reasonably could believe he did have only one wife at the deferred inspection: Ariej Gowda Ali. The government offered nothing about this relationship to suggest this was implausible. This brief description by Ms. Rogers of a single event eleven years earlier was insufficient to establish the statement was

37

false.

Finally, Count Six alleged Mr. El Sayedri falsely stated he did not have a "relationship" with Ms. Sabar. Native English speakers can differ on the meaning of the word "relationship." It only becomes more confusing for a person for whom English is a second language. The use of the term "relationship" appears to have been used to trap Mr. El Sayedri by its ambiguity rather than inform the listener. Indeed, the domestic history between Mr. El Sayedri and Ms. Sabar was such that many native English speakers might also conclude they had no "relationship." Reliance on this single, ambiguous word in a very lengthy, unrecorded and untranslated interrogation, by a person for whom English is a second language was insufficient to support Count Six. The evidence was insufficient to establish these three statements were false and that Mr. El Sayedri knew they were false when made.

### ii. If Any of the Alleged Statements Were Shown to Be False, the Evidences Was Insufficient to Establish Any Statement Was Material

The government offered no evidence these statements, if false, were material in any way. Ms. Blessinger testified the purpose of a deferred inspection was to confirm simply to confirm the alien had no warrants outstanding or otherwise, by some event on record, had become inadmissible *since his departure* from the United States. Ms. Blessinger testified the deferred inspection in this case transcended in duration and subject matter the true purpose of a

deferred inspection and the three alleged false statements were immaterial to the purpose of the interview because none of these statements in any way addressed a change in Mr. El Sayedri's circumstances **since his departure** from the United States.

### iii. If Any of the Alleged Statements Were Shown to Be False and Material, the Evidence Was Insufficient to Establish These Statements Were Made in a Matter Within the Jurisdiction of the Executive Branch of the United States Government

Finally, the government offered no evidence the deferred inspection was a matter within the jurisdiction of the executive branch of the United States government. Instead, the government moved laterally and asserted that the jury could infer that because Officer Stunkle stated he worked for the Department of Homeland Security, the jury could infer that he therefore worked in the executive branch of government.

First, the district court itself observed that had the government requested it to do so, it likely would have taken judicial notice that the Department of Homeland Security was within the executive branch of the United States Government. JA 1845. Though this would have assisted the government in meeting its burden on this element, it would not have been sufficient, standing alone, to close the circle regarding this element of the offense charged in Count Six.

The issue was not merely whether Officer Stunkle was employed by the executive branch and whether such an inference may

permissibly be drawn from testimony he worked for the Department of Homeland Security. That impermissible inference took the government only halfway. The further inference, also unsupported by the record, must be that while the witness was employed by the executive branch of government, the Mr. El Sayedri's alleged false statement was made to this employee of the executive branch in relation to a "matter within the jurisdiction of the executive branch of the United States Government." Officer Stunkle's employment was one thing, whether the investigation was within the jurisdiction of the executive branch of government was another thing entirely.

The district court erred when it allowed the government too many inferences. In deciding whether or not the government proved its case, the district court was required to consider the evidence, both circumstantial and direct and "allow the government the benefit of all reasonable inferences **from the facts proven** . . .." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982)(emphasis provided). The inference must arise from a proven fact. In this case, it did not.

Thus, in order for this Court to reach the conclusion that the jury should have been able, rationally, to infer that Mr. El Sayedri's statements were made concerning a matter within the jurisdiction of the executive branch of the United States Government, the jury must first have been able to infer, rationally, that the witness to whom the statement was made was employed by the

40

executive branch of government.  As the Court itself noted at the hearing on Mr. El Sayedri's motion for judgment of acquittal, this the jury could not do.  There was no basis to infer one branch of government over another, let alone that the Department of Homeland Security was in any branch of the federal government.

However, even assuming this first inference was a permissible leap, this first inference did not serve as a legitimate springboard from which the jury could make the second inference: that Mr. El Sayedri's statements were made concerning a matter within the jurisdiction of the executive branch of government.  This balancing of one inference on the back of another is not permitted.  *Direct Sales Co. v. United States*, 319 U.S. 703 (1943); *United States v. Burgos*, 94 F.3d 849, 893 (4th Cir. 1996).  Inferences must be based on proven facts, on evidence (either circumstantial or direct), but not on other inferences.  The government offered no evidence on this issue.  The Court should dismiss Count Six.

## II. The District Court Should Have Granted Mr. El Sayedri and Ms. Sabar's' Motions for a Mistrial on Count One Because the Government Failed to "Connect-up" the Conspiracy by Evidence Independent of the Co-Conspirator Hearsay Statements.

### A.  Standard of Review

Abuse of discretion. *United States v. Robinson*, 627 F.3d 941, 948 (4th Cir. 2010); *United States v. Mills*, 2014 U.S. App. LEXIS 2998, 3 (4th Cir. Va. Feb. 19, 2014).

**B.    Argument**

Mr. El Sayedri and Ms. Sabar moved the Court for a *James* hearing to require the government to establish the existence of a conspiracy independent of the coconspirator hearsay statements, as a precondition for the introduction of coconspirator hearsay statements at trial.  The district court erred when it denied the motion.

Co-conspirator statements are admissible hearsay under certain circumstances.  *United States v. James,* 590 F.2d 575 (5th Cir.), *cert. denied,* 442 U.S. 917 (1979), recommends a procedure whereby the government is required to submit evidence to establish the existence of a conspiracy by a preponderance as an evidentiary foundation for the admission of coconspirator hearsay at trial:

> [t]he court must determine as a factual matter whether the prosecution has shown by a preponderance of the evidence independent of the statement itself (1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the coconspirator's statement is offered were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy.

*James,* 590 F.2d at 582-83.  The district court may make this inquiry 1) at the outset of trial, 2) during the course of the trial, when the government offers co-conspirator hearsay against the defendant, or 3) at the conclusion of the government's evidence, to determine whether the government has "connected up" the hearsay statements to the government's predicate evidentiary burden. *James, supra.*

The more sensible time for such a hearing was pre-trial, before

admitting the co-conspirator's declarations. Mr. El Sayedri and Ms. Sabar sought this pretrial hearing and asserted that the it was necessary to avoid denial of their Fifth Amendment right to due process of law and their Sixth Amendment right to confront witnesses.

Instead, the district court opted to permit the government the opportunity to establish the evidentiary foundation during its case-in-chief. *James* anticipates that this option exposes the government to a mistrial in the event it is unable to "connect-up" the coconspirator:

> While the government here urges that the practice of "connecting up" be permitted to continue at the discretion of the trial judge, it suggests a remedy for failure to make the connection which may be more burdensome and expensive of prosecutorial and judicial effort than a reordering of the proof. The government suggests that "should the trial judge determine that the government has not carried its burden in connecting the previously admitted evidence, the court may 'upon appropriate motion, declare a mistrial, unless a cautionary instruction to disregard the statement would suffice to cure any prejudice.'"

*Id.* at 582.

Though this Court does not *require* a *James* hearing, it cautions that co-conspirator hearsay statements are admitted *conditionally,* subject to the government's burden to establish the factual predicate that the declarant is a member of the conspiracy and the statements were made in furtherance of that conspiracy. *United States v. Hines,* 717 F.2d 1481, 1488 (4th Cir. 1983), *cert. denied,* 467 U.S. 1214 (1984). *T*he government proceeds at its peril. In the

event the government fails to "connect-up" the conspiracy by evidence independent of the co-conspirator hearsay statements, the Court must declare a mistrial:

> This court, however, does not require the *James* hearing. Instead, a trial judge retains the option to admit conditionally the declarations of co-conspirators before the conspiracy has been independently established, subject to the subsequent fulfillment of that factual predicate. . . The district court safeguards the defendant's rights by being prepared either to declare a mistrial or to dismiss the case if the government fails to prove *aliunde* that a conspiracy existed.

*Id.* at 1488 (citations omitted).

In *United States v. Jackson*, 757 F.2d 1486, 1490 (4th Cir. 1985), the Court held "the court may admit co-conspirator's out of court statements under Rule 801(d)(2)(E) only if the government presents substantial independent non-hearsay evidence of the conspiracy and [the defendant's] connection to it." *Jackson* cited to *United States v. Stroupe*, 538 F.2d 1063, 1065 (4th Cir. 1976) for support of this proposition.

*Jackson* went on to hold "the court may admit the hearsay and later declare a mistrial, or, when appropriate, exclude the hearsay and give a limiting instruction, if the government fails to connect up with independent evidence." *Id.* at 1490.

The conspiracy alleged in Count One in this case, between the named defendants, is summarized as follows:

> From in or about December 2000, through and including the present, within the Eastern District of Virginia and elsewhere, the defendants, Mr. El Sayedri, Ms. Sabar, and ALMAHADI ALI did knowingly and unlawfully combine,

44

conspire, confederate and agree with each other, and
others known and unknown to the Grand Jury, to commit an
offense against the United States, to wit: knowingly to
make under oath, and as permitted under penalty of
perjury, and knowingly subscribe as true, a false
statement with respect to a material fact in an
application affidavit, and other document required by the
immigration laws and regulations prescribed thereunder,
and knowingly to present an application containing any
such false statement, in violation of 18 U.S.C. §
1546(a).

JA 77. Second Superseding Indictment, Count One, ¶ 2.

The Court granted the Rule 29 motion as to Mr. Ali. Thus, the
government failed to "connect-up" the conspiracy as charged,
including Mr. Ali as a co-conspirator, by evidence independent of
the co-conspirator hearsay statements admitted subject to this
foundation. Mr. Ali's A-file, received during trial, was *a fortiori*
inadmissible as a co-conspirator statement when the district court
granted the Rule 29 motion as to Mr. Ali. Further, as noted above,
the evidence failed utterly to establish that Mr. El Sayedri and Ms.
Sabar were ever co-conspirators. Ms. Sabar was a sixteen year old
child living in the Sudan in December 2000. There is no evidence
that Mr. Ali, who was also living in Sudan in 2000, had any
knowledge of, or connection to, Mr. El Sayedri, a man approximately
30 years his senior. Every alleged overt act by Mr. El Sayedri and
Ms. Sabar, even if true, advanced only his or her own interests.
The record failed to prove Ms. Sabar and Mr. Ali were aware of, and
agreed to, Mr. El Sayedri's alleged conduct in December 2000. This
was three years before Ms. Sabar even married Mr. El Sayedri and

45

five years before she ever came to the United States. This tenuous evidence of a conspiracy failed to "connect-up" the inadmissible hearsay statements conditionally admitted by the district court.

The government gambled the district court would find the government met its burden of proving Mr. Ali's participation and of proving that Mr. El Sayedri and Ms. Sabar were co-conspirators. The government lost this gamble. The Court tried the cure the problem by not sending Mr. Ali's immigration file to the jury at the close of all the evidence. However, key portions of the file had already been shown to the jury and the jury was not instructed as to the reason they were not given Mr. Ali's immigration file. In addition, Ms. Sabar's immigration file (or the key portions thereof) and Mr. El Sayedri's immigration file still came in. Furthermore, while the district court admitted the Canadian files for both Mr. El Sayedri and Ms. Sabar, it specifically stated that it did not find Ms. Sabar's Canadian immigration file was in furtherance of any conspiracy in the United States. JA 1578-1579. No reasonable juror could parse this kaleidoscope of conflicting evidence to make the needed distinctions. *Hines* and *Jackson* control. The district court erred with it refused to declare a mistrial and dismiss Count One.

**III. The District Court Erred When it Failed to Sever Counts Nine, Ten and Eleven and When it Refused to Order a New Trial on Counts One, Five and Six after Granting Rule 29 Motions as to Counts Nine, Ten and Eleven**

    **A.    Standard of Review**

Abuse of discretion. *United States v. Medford*, 661 F.3d 746,

46

753 (4th Cir. 2011); *United States v. Rusher*, 966 F.2d 868, 878,

(4th Cir. 1992).

**B.    Argument**

**1.    The District Court Erred When it Denied Mr. El Sayedri and Ms. Sabar's Motions to Sever Counts Nine, Ten and Eleven on the Grounds of Improper Joinder**

Mr. El Sayedri and Ms. Sabar moved the Court to sever Counts Nine, Ten and Eleven from the other counts in the indictment, pursuant to Fed. R. Crim. P. 8(a) and Fed. R. Crim. P. 14. Mr. El Sayedri and Ms. Sabar were charged in an eleven count Second Superseding Indictment, as follows:

| COUNT | CHARGE |
|-------|--------|
| 1 | Conspiracy to Commit Immigration Document Fraud |
| 2-4 | Immigration Document Fraud |
| 5 | Passport Forgery |
| 6 | False Statements |
| 7-8 | Encouraging and Inducing an Alien to Live in the United States |
| 9-11 | Aggravated Identity Theft |

Count One alleged Conspiracy to Commit Immigration Document Fraud, in violation of 18 U.S.C. § 371. Count Five charged Mr. El Sayedri with Passport Forgery, in violation of 18 U.S.C. § 1543. Count Six charged Mr. El Sayedri with False Statements, in violation of 18 U.S.C. § 1001. Admittedly, these counts were interconnected and appropriately should have been tried together.

47

Counts Nine, Ten and Eleven, however, charged Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A. This offense, unlike the above-described immigration fraud related offenses, arose out an alleged fraudulent application to rent an apartment under Section 8 of the United States Housing Act of 1937, codified at 42 U.S.C. § 1437. Counts Nine, Ten and Eleven had no relationship to the immigration fraud counts and related counts contained in the indictment.

Fed. R. Crim. P. 8(a) provides that two or more offenses may be charged and tried together "if the offenses . . . are of the same or similar character, or are based on the same act or transaction, or are connected with, or constitute parts of a common scheme or plan." "Fed. R. Crim. P. 8(a) permits 'very broad joinder,' because the prospect of duplicating witness testimony, impaneling additional jurors, and wasting limited judicial resources suggests that related offenses should be tried in a single proceeding." *United States v. Mir*, 525 F.3d 351, 357 (4th Cir. 2008)(quoting *United States V. Mackins*, 315 F.3d 399, 412 (4th Cir. 2003). The requirements of Rule 8(a), however, "are not infinitely elastic . . . and so cannot be stretched to cover offenses . . . which are discrete and dissimilar." *Mackins*, 315 F.3d at 412. Joinder of unrelated charges "create[s] the possibility that a defendant will be convicted based on considerations other than the facts of the charged offense." *United States v. Cardwell*, 433 F.3d 378, 385 (4th

48

Cir. 2005).

The Fourth Circuit has considered several occasions where joinder impermissibly extended the reach of Fed. R. Crim. P. 8. In *United States v. Cardwell*, 433 F.3d 378 (4th Cir. 2005), the defendant, Leo Hinson, was involved in a plot to hire someone to murder a government cooperator. When executing a search warrant at Hinson's house, police discovered a loaded gun. Hinson was charged in the same indictment with several counts relating to the murder-for-hire scheme and was also charged with being a felon in possession of a gun. The Court rejected the government's argument that joinder of the possession charge was permissible because the gun was seized during the murder-for-hire investigation:

> While discovery of the gun during the murder-for-hire investigation shows a temporal relationship between Hinson's gun possession and the murder-for-hire-plot, i.e., that they occurred at the same time – we do not believe that a mere temporal relationship is sufficient to show that the two crimes at issue here were *logically* related (citing *United States v. Mackins*, 315 F.3d 399, 413 (4th Cir. 2003); *United States v. Singh*, 261 F.3d 530, 532-33 (5th Cir. 2001) . . . . A contrary holding would effectively read Rule 8(a) to allow limitless joinder whenever the charge resulted from the fruits of a single investigation.

*Cardwell*, 433 F.3d at 386. Ultimately in *Cardwell*, the Fourth Circuit held that joinder was permissible because of the additional fact that Hinson stated, "if I knew [sic] it was the police, I would have gotten a gun," and "there would have been a gunfight [because I would] rather be killed than go to jail." *Id.* at 384. The Fourth Circuit held that joinder was permissible in that case because

49

"Hinson's expressed willingness to use the gun to protect himself from suffering the repercussions of his participation in the murder-for-hire scheme supplies a logical connection between the two counts." *Id*. at 387.  No such logical nexus exists in this case, connecting Counts Nine, Ten and Eleven to the other counts in the Second Superseding Indictment .

In *United States v. Mackins*, *supra*, the Fourth Circuit held that the district court erred in joining a counterfeit check charge against one of the defendants, with drug and money laundering charges against several defendants who were tried together:

> In this case, the only connection we see between the 1996-1997 counterfeit check conspiracy alleged in Counts One-Three and the 1982-1998 drug and money laundering conspiracies alleged in Counts Four and Five is Willie Mackins.

*Id*. at 413.  The Court noted that although Rule 8(a) permits broad joinder of charges, it "'cannot be stretched to cover offenses . . . which are discrete and dissimilar and which do not constitute parts of a common scheme or plan.'" *Id*. at 412-13 (quoting *United States v. Richardson*, 161 F.3d 728, 733 (D.C. Cir. 1998).

In *United States v. Foutz*, 540 F.2d 733 (4th Cir. 1976), the defendant was charged with two bank robberies in the same indictment.  In the first bank robbery, the defendant was alleged to have robbed a bank alone with a handgun.  Three months later, Foutz was alleged to have robbed the same bank a second time with two accomplices.  In both incidents, the robbers escaped down the

same side street.  The Court held that the trial court abused its discretion in failing to grant a severance.  *Id.* at 735-36.  The Court noted three potential sources of prejudice:

> (1) the jury may confuse and cumulate the evidence, and convict the defendant of one or both crimes when it would not convict him of either if it could keep the evidence properly segregated; (2) the defendant may be confounded in presenting defenses, as where he desires to assert his privilege against self-incrimination with respect to one crime but not the other; or (3) the jury may conclude that the defendant is guilty of one crime and then find him guilty of the other because of his criminal disposition.

*Foutz*, 540 F.2d at 736.  Each source of prejudice identified in *Foutz* could have application in the instant case.

In *United States v. Hawkins*, 589 F.3d 694 (4th Cir. 2009), the defendant was indicted on separate counts related to a car jacking and a subsequent arrest as a felon in possession of a firearm.  The defendant moved the court to sever the car jacking counts from the felon in possession charge on the grounds of improper joinder.  The Fourth Circuit found the government proffered no evidence demonstrating a logical and close connection between the alleged car jacking and possession of a .357 caliber revolver on a subsequent occasion.  While the offenses all involved firearms, albeit different firearms, nothing tied them together except the defendant himself.  The Fourth Circuit held the error in misjoinder affected the defendant's substantial rights.

The Fourth Circuit's concern for misjoinder, evidenced by these cases, informs the reasonable reach of joinder under Fed. R. Crim.

P. 8(a).  The government attempted too much in this indictment.
Counts Nine, Ten and Eleven should have been severed as improperly
joined.

Further support for this conclusion is found in interplay
between Fed. R. Evid. 403 and 404.  Had the case gone to trial
without Counts Nine, Ten and Eleven, the question becomes whether
the district court properly should have allowed evidence of these
severed counts at the trial on Counts One, Five and Six.  Such
evidence would not have assisted the jury on Counts One, Five and
Six on any permissible ground contemplated by Fed. R. Evid. 404,
including motive, opportunity, intent, preparation, plan, knowledge,
identity, absence of mistake, or lack of accident.  Further, even
if arguably relevant under  Fed. R. Evid. 404, the balancing test
required by Fed. R. Evid. 403 would have compelled the exclusion of
this evidence related to Counts Nine, Ten and Eleven at the trial.
The district court erred when it denied a severance of Counts Nine,
Ten and Eleven.

> **2.    The District Court Erred When it Refused to Order a
> New Trial on Counts One, Five and Six after Granting
> Rule 29 Motions as to Counts Nine, Ten and Eleven
> Which Caused Prejudicial Spillover into the Pool of
> Evidence Appropriately Before the Jury as to Counts
> One, Five and Six**

"Generally, invalidation of the conviction under one count does
not lead to automatic reversal of the convictions on other counts."
*United States v. Pelullo*, 14 F.3d 881, 897 (3d Cir. 1994).  Rather,
prejudicial spillover analysis requires a finding that "there was

a spillover of evidence from the reversed count that would have been inadmissible at a trial limited to the remaining count." *United States v. Cross*, 308 F.3d 308, 319 (3d Cir. 2002). If so, relief hinges on whether the error was harmless, that is, whether it was probable the error influenced the jury's verdict on the remaining counts. *United States v. Gambone*, 314 F.3d 163, 181 (3d Cir. 2003).

Harmlessness is determined by conducting a four-part inquiry into whether, (1) the charges are intertwined with each other; (2) the evidence for the remaining counts is sufficiently distinct to support the verdict on th[ose] counts; (3) the elimination of the invalid count significantly changed the strategy of the trial; and (4) the prosecution used language of the sort to arouse the jury. *United States v. Murphy*, 323 F.3d 102, 118 (3d Cir. 2003) (quotation marks omitted) (citing *Pelullo*, 14 F.3d at 898-99).

Evidence supporting the accusation of aggravated identity spilled over from Counts Nine, Ten and Eleven, which were ultimately dismissed by the district court, into the pool of evidence received as to Count One, Five and Six. Counts One, Five and Six were not intertwined with Counts Nine, Ten and Eleven. The evidence as to each group was thoroughly distinct. Eliminating the evidence as to Counts Nine, Ten and Eleven from the trial altered the trial strategy significantly. This prejudicial spillover compelled a new trial on Counts One, Five and Six and the district court erred when it denied this request. JA 1898.

"The court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A court need assign no reason other than that it is required in the interest of justice. *United States v. Smith*, 331 U.S. 469 (1947). The interest of justice controls this decision and thus must be the Court's lodestar. *United States v. Mitchell*, 602 F.2d 636, 639 (4th Cir. 1979) ("In circumstances [in which the defendant files a motion for new trial under Rule 33], the interest of justice is the touchstone for consideration."); 3 Wright & Miller, Federal Prac. & Proc. § 556 (1982) ("Any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial."). "[T]he meaning of the phrase in 'the interest of justice' in the context of Rule 33 is not difficult to discern; the phrase's plain meaning makes unmistakably clear that granting a new trial is discretionary, and the cases reflect that this discretion should be exercised where it is demonstrated that the fundamental fairness or integrity of the trial result is substantially in doubt." *United States v. Jennings*, 438 F. Supp.2d 637, 642 (E.D. Va. 2006) (Ellis, J.); accord *United States v. Prescott*, 221 F.3d 686, 688 (4th Cir. 2000) ("By its terms, Rule 33 confers broad discretion on a district court.").

Further, the test is not that there necessarily was error during trial:

> The basis for granting a new trial under Rule 33 is
> whether it is required "in the interest of justice." That

is a broad standard. It is not limited to cases where the district court concludes that its prior ruling, upon which it bases the new trial, was legally erroneous.

*United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994). Thus, even if there is no error, the result may nevertheless necessitate a new trial in the interest of justice:

As stated, this is not a case where the government failed to obey a discovery order. We are not willing to say that there can never be a case where, even without wrongdoing, circumstances are such that the trial was, nevertheless, fundamentally unfair.

*United States v. Martinez*, 763 F.2d 1297, 1315 (11th Cir. 1985).

The district court granted the Rule 29 motions as to Counts Nine, Ten and Eleven. In doing so the district court confronted the question whether the evidence offered as to those three counts allowed "a rational trier of fact" to "have found the essential elements of the charged offense beyond a reasonable doubt." *United States v. Bonner*, 648 F.3d 209, 213 (4th Cir. 2011).

Though dismissed, it was too late. The jury already heard significant compounding evidence on Counts Nine, Ten and Eleven, as feared, that was unrelated and distinct from Counts One, Five and Six. This evidence influenced the jury in its deliberations regarding these counts.

Inserting these charges into the indictment was the only way the government could get this evidence before the jury. If uncharged, the district court would never have admitted evidence as to Counts Nine, Ten and Eleven under Fed. R. Evid. 404. Having done

55

elected to wedge these counts into this trial, the government had the burden and responsibility of offering a substantive case as to Counts Nine, Ten and Eleven. The law of this case is the government failed to meet this burden to Mr. El Sayedri and Ms. Sabar's detriment as to Counts One, Five and Six. The interest of justice recommends a new trial is necessary, pursuant to Fed. R. Crim. P. 33, at which extraneous evidence of aggravated identity theft will be inadmissible.

### CONCLUSION

Mr. El Sayedri and Ms. Sabar respectfully move the Court dismiss Counts One, Five and Six.

### REQUEST FOR ORAL ARGUMENT

The Appellants request the opportunity to present oral argument in support of this appeal.

Respectfully Submitted,

Younis El Sayedri
Runeen Sabar
By Counsel

DELANEY, McCARTHY & COLTON, P.C.

BY:___/s/_____
   Joseph J. McCarthy, VSB # 19006
   510 King Street, Suite 400
   Alexandria, Virginia 22314
   (703) 549-9701 - o
   (703) 836-4285 - f
   mccarthy@lawdmc.com
   Counsel for Younis El Sayedri

56

TAYLOR LAW COMPANY

BY:_____
    Gretchen Lynch Taylor
    10605 Judicial Drive
    Suite A-5
    Fairfax, VA 22030
    (703) 385-5529 - o
    (703) 934-1004 - f
    gretchen@taylorlawco.com
    Counsel for Runeen Sabar

57

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE
## AND LENGTH LIMITATIONS

1.  This brief has been prepared using (SELECT AND COMPLETE ONLY ONE):

___    Fourteen point, proportionally spaced, serif typeface (such as CG Times or Times New Roman, NOT sans serif typeface such as Arial).  Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, CG Times, 14 point):

_____

_X_    Twelve point, monospaced typeface (such as Courier or Courier New).  Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, Courier, 12 point):

_____

2.  EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations; and the certificate of service, the brief contains (SELECT AND COMPLETE ONLY ONE):

___  _____ Pages (give specific number of pages; may not exceed 30 pages for opening or answering brief or 15 pages for reply brief); OR

_X_  __13, 874___  Words (give specific number of words; may not exceed 14,000 words for opening or answering brief or 7,000 for reply brief); OR

___  _____  Lines of Monospaced Type (give specific number of lines; may not exceed 1,300 lines for opening or answering brief or 650 for reply brief; may be used ONLY for briefs prepared in monospaced type such as Courier or Courier New).

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

_____
_/s/_____
Joseph J. McCarthy

58

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2014, I filed with the Clerk's Office of the United States Court of Appeals for the Fourth Circuit the required copies of Appellants' Brief and Appendix via hand delivery and have electronically filed the Brief of Appellants using the Court's CM/ECF system which will send notification of such filing to the following counsel:

Christine Alexandria Bogle
Julia K. Martinez
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, VA 22314-5194
Email: christine.bogle@usdoj.gov
Email: julia.martinez@usdoj.gov

/S/ _____
Joseph J. McCarthy

59